RUSSEL HARVEY
1300 WASHINGTON AVE
PO Box 190434
MIAMI BEACH, FL
33119-9998
PHONE: (646) 709-3163
EMAIL: Rustymail@Yahoo.com



FILED by __PG__ D.C.

DEC 1 2 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

## U.S. DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA

RUSSEL HARVEY,                                )
                                             )   Case No.
                                             )
                    *Plaintiff,*              )
                                             )
        - against -                          )
                                             )
CITY OF MIAMI BEACH, AND                     )
ROBERT LAWRENCE                              )
                                             )
                                             )
                    *Defendants.*             )

Russel Harvey, *pro se*

December 11th, 2017

<u>Preliminary Statement</u>

1.  This is a Civil Rights Act action for damages defendants together, individually and also collectively caused me by their participation in a wrongful and unwarranted eviction from my home in the State of Florida, for which Robert Lawrence, at the time a Miami Beach Police Officer, who was trained by and acting under the supervision and policies of the City of Miami Beach and its Police Department, illegally entered my apartment, used excessive force by threatening me with arrest, (though his actions also did constitute an illegal, unwarranted arrest, or "False Arrest"), bodily injury and the loss and destruction of my personal property, and forced me from my home with his illegal acts, on December 11th, 2013.

<u>Jurisdiction and Venue</u>

2.  This action arises under 42 U.S.C. § 1983 and principles pendent thereto and by 28 U.S.C. § 1343(a).

3.  I demand a jury trial.

4.  All of the acts sued upon and otherwise relevant to this lawsuit occurred and the parties at all relevant times resided or were conducting business in ways relevant to this lawsuit in Miami Beach, FL, within the venue of the U.S. District Court for the Southern District of Florida.

THE PARTIES

5.  I, Russel Harvey, am a United States citizen who was and is a resident of Miami-Dade County, Florida. At the times relevant to this lawsuit, I resided at 216 43rd Street, Apartment 107, Miami Beach, Florida 33140 at the Hotel Pierre ("unit"). I am a clean-living person of good

character, a college graduate, and a talented artist, writer, photographer, performer, and journalist. I have contributed thousands of hours of time and effort to public service work, at the grass roots and national levels, by using my special performance and artistic skills (for which I have received numerous awards, citations, favorable media coverage and commendations) and have, among other things, been a professional cartoonist and entertainer and caricaturist at over one thousand events (*e.g.*, at major resorts, private and corporate parties, and on also on national television) including with a history of working with people of all ages without having ever done any sort of inappropriate much less of criminal behavior. I have never been convicted of any crime, even the slightest misdemeanor.

6. Defendant City of Miami Beach is a municipality in the State of Florida, a state actor or "person" for Section 1983 purposes, and is obliged by applicable state and federal law. Among other activities, The City of Miami Beach employs and operates a police department, for which it is responsible for hiring, training, supervising and setting policies for its police officers, including Robert Lawrence.

7. Defendant Robert Lawrence was employed by the City of Miami Beach, FL, as a police officer, a state actor under color of state law, at the time he engaged in acts which violated my Civil Rights on December 11th, 2013.  Officer Lawrence is no longer employed by the City of Miami Beach. On information and belief, Officer Lawrence is no longer a police officer in the State of Florida.

THE FACTS

8. I moved into the unit on October 9, 2013.

9.  I agreed to pay my Landlord $350 a week to rent the unit.

10.  I discussed with the Landlord's employees that I planned to live in the unit for an indefinite amount of time.

11.  On December 9, 2013, Juan Ortega ("Manager"), a manager working for my Landlord, asked me to move to a different unit.

12.  I declined the request and remained in the unit.

13.  On December 9, 2013, an employee for the Landlord named Stephanie, came to my unit and told me that I must sign a waiver stating that I was a transient guest of the Landlord.

14.  I refused to sign the agreement and attempted to pay a full week's rent of $350.

15.  Stephanie refused to accept payment of $350, but accepted $100, which was the rent due through Wednesday, December 11, 2013.

16.  On December 10th, 2013, 8:10 AM, I sent an email to the manager, with copies to Miami Beach Police Department "Neighborhood Resource Officers," Deborah Doty and Ernesto Rodriguez, reminding him that "my status as a 'non-transient' is clear pursuant to Florida Law," and "This is my Sole Residence. I have NO other residence."

17.  In my email, I told the manager, "You may not violate my rights as a tenant which are stated in the Florida Landlord Tenant Act:  FL S Chapter 83, Part II, Residential Tenancies.  I

would be entitled to civil, statutory damages equal to three months of rent for each and every act of yours which violates the prohibited practices." I gave the manager a link to the Internet address of the Florida Landlord Tenant Act.

18. I also told the manager to "Please also see" a booklet published on the Internet titled "Rights of Occupants Living in a Motel, Hotel or Roominghouse," a publication of "Legal Services of Greater Miami, Tenants' Rights Project" and gave him a link to the Internet address for this booklet, too.

19. I told the manager, "I have been a good tenant, created no problems, engaged in no misconduct, and paid all rent, timely. I would like to continue living here under our Landlord/Tenant relationship. However: WITHOUT PREJUDICE: If it is your desire to terminate my tenancy, I am willing to discuss with you a fair and just resolution of our differences, which will avoid your needing to pay legal fees, court costs, etc.."

20. I closed this email, saying, "PS: I send a CC of this email to Miami Beach Police Department, Neighborhood Resource Officers, Ernesto Rodriguez, and Deborah Doty, as I believe they may be helpful in resolving this situation and explaining the legal issues and your obligations."

21. After sending them a CC of this email, I followed up by calling both Officers Rodriguez and Doty, and leaving voicemails for them, notifying them verbally of the email I had sent and asking them to call me or email me so that they could intervene with the Landlord because I feared the Landlord was going to attempt a "self help eviction."

22.  Both Officer Rodriguez and Officer Doty ignored my pleas for help.

23.  On December 11th, 2013, at 2:40 AM, I sent another email to the manager in which, "without prejudice," I made a "settlement offer," essentially offering to give up my rights to my unit, in return for, merely, having the right to remain a tenant for three weeks, until January 2nd, 2014, free of charge.  I told the manager that, as an act of "goodwill," I was willing to do this, "even though, obviously, my rights as a non-transient tenant might allow me to have a more favorable alternative outcome, particularly in the length of time I might be able to hold onto possession of the room/apartment. In that spirit, I ask you consider the benefits to you and your corporation as compared with the alternative remedy of costly and time consuming litigation for possession pursuant to The Landlord Tenant Act, FL S 83, Part II, Residential Tenancies."

24.  On the morning of December 11, 2013, at approximately 11:30 AM, the manager, along with Miami Beach Police Officer Robert Lawrence, knocked on the door of my unit.

25.  I later learned that it is not clear exactly how the manager was able to engage Officer Lawrence. The City of Miami Beach later told me that the manager did not call 911 or the Police Department, directly, and there is no record of Officer Lawrence being dispatched to the scene. Following the incident, Officer Lawrence told an Internal Affairs Officer that he just happened to be driving by the building and the manager just happened to be standing outside and waved him down.

26.  The Manager and Officer Lawrence demanded that I vacate the unit.

27.  Officer Lawrence told me that I was not a tenant. He stated that the building was a hotel

and the hotel does not have tenants and that that I must vacate the unit.

28. Officer Lawrence told me that if I did not comply and vacate the unit, I would be arrested.

29. Officer Lawrence remained within the doorway of the unit while I gathered my belongings.

30. I attempted to inform Officer Lawrence and the Manager that I was a tenant, the unit was my sole residence, and that I was not a transient guest.

31. Officer Lawrence demanded I vacate the unit again, threatening arrest if I did not leave.

32. Officer Lawrence said the Landlord did not have to go through an eviction and I could be ejected because my building was a "Hotel." This was erroneous because, pursuant to Florida law, as I note elsewhere in this Complaint, only transient guests may be ejected from a hotel. Non-transient tenants in hotels have the same rights of tenancy as non-transient tenants in other types of dwellings.

33. Though my building, "Hotel Pierre," has the word "Hotel" in its name, the name of a building is not dispositive of its status. For instance, many people, including wealthy people own or rent non-transient apartments at buildings with the word "hotel" in their names, such as "The Plaza Hotel" in New York, or "The Fontainebleau Hotel," in Miami Beach.

34. Officer Lawrence said that my building was "licensed as a hotel." However, as I later

learned, my Landord actually did not have any license, at the time, as required by "The Florida Department of Business & Professional Regulation." In fact, in the years prior to my tenancy, the only license the Landlord had from the State was for "non-transient apartments."

35. Obviously, Officer Lawrence did not see a "hotel license," because the Landlord did not have one. However, even if the Landlord had a "hotel license," it would not have negated the controlling fact that I was a non-transient tenant pursuant to Florida law: I had been a tenant for more than thirty days (since October 9th, 2013), and it was my sole residence.

36. When I tried to show Officer Lawrence the relevant statutes and legal guidelines on my laptop, he yelled at me, "Shut that fucking computer off and pack it up or I'll smash it over your head!"

37. When I showed him receipts, proving I had been living in my apartment since October 9th, he refused to look at them, and said he would arrest me if I didn't shut up.

38. Officer Lawrence badgered me to move faster. When I explained I had a disability (a phobia of germs, or "OCD") and that it made it difficult to pack, quickly, and that I would occassionally have to wash my hands, (for example, after putting my dirty laundry in a box, I needed to wash my hands before handling my clean clothes and papers), he mocked me. He yelled that he didn't want to see me wash my hands, called me a "freak" and a "weirdo" because I used Lysol and antibacterial soap, and said I "belong in a group home."

39. When I did not pack as fast as he wanted, he yelled, "You have ten more minutes, or I'm going to throw all your shit out the window and set it on fire!"

40.  Several times, Officer Lawrence threatened to arrest and handcuff me.

41.  At one point, Officer Lawrence stepped away from my door, but demanded I leave it open while I continued packing. At this point, I called the City of Miami Beach Police Department and requested they immediately send a supervising officer to protect me from Officer Lawrence's misconduct. As I was talking to the dispatcher, Officer Lawrence saw me on the phone, demanded to know who I was talking to, and demanded I hang up. I ended the phone call.

42.  A few minutes later, I overheard Officer Lawrence talking on his phone or radio. I believe he was talking to the police dispatch. He told the person that he had the situation under control and that they should not send a supervisor.

43.  During the time that Officer Lawrence was evicting me, and though they had plenty of time to do so, the City of Miami Beach Police Department did not send a supervising officer (for instance, a Sergeant or Lieutenant) to stop Officer Lawrence from violating my civil rights and to protect me from his misconduct.

44.  I vacated the unit after collecting my belongings to avoid being arrested.

45.  After Officer Lawrence forced me out of my apartment, and made me put my belongings on the sidewalk, he pulled over a taxi and ordered me to get in the cab and drive away with my things. I told him I did not want to spend money on a taxi. He threatened to arrest me for being a vagrant without any money. I then moved my things farther down the sidewalk and he left.

46.  After I was ejected,  I spent several hours on the sidewalk near the hotel, calling City

Officials for help.  After about an hour, a Sergeant came. It was Sgt. Campbell.  He was

impatient with me as I tried to show him papers proving my non-transient tenancy. He refused to

demand that the manager restore me to my residence. He then said he had a "more important"

call and left.

47.  I talked to a paralegal with the City Attorney's Office, Brett Becker, and Mr Becker put

me in contact with an Assistant City Attorney for the City of Miami Beach, Aleks Boksner. Mr

Boksner advised a Miami Beach Police Department Captain, who called me, but our call was

disconnected, and I could not call him back as I did not have his number.

48.  Eventually, Sgt. Houser came and talked with me on the sidewalk, but Sgt. Houser said

he could not force the Hotel to reinstate me in my apartment.  Sgt. Houser told me that the

Landlord had (falsely) told him that I had only lived there since December 1st, but I proved that

was a false statement when I showed him my receipts going back to October 9th.  I also called

my bank on speakerphone which confirmed my contact address was 216 43rd st, Apt 7, Miami

Beach, as Sgt. Houser listened in, as additional proof of my tenancy. Sgt. Houser said, "I'm not

going to stick my neck out for anybody." He said that he called a State Attorney and she told him

that, once I was out of my unit, it was no longer a police matter, and the only way I could get

back in was through a civil lawsuit.

49.  I spent six hours on the sidewalk with my belongings after being forced out of my unit.

50.  I resided a total of 64 days in the unit, before being illegally and forcibly removed from

my unit.

51.  The unit is a dwelling defined in Fla. Stat. § 83.43(2) as "[a] structure or part of a structure that is rented for the uses as a home, residence or sleeping place by one person . . ."

52.  Only transient occupancy in a hotel is excluded from application of the Florida Residential Landlord and Tenant Act, Chapter 83, Fla. Stat. See Fla. Stat. § 83.42(3).

53.  I had an agreement with the Landlord to the use and occupy the unit, making me a tenant. See Fla. Stat. § 83.43(4).

54.  While residing in the unit, the unit was my sole residence.

55.  "There is a rebuttable presumption that, when the dwelling unit occupied is the sole residence of the guest, the occupancy is nontransient." See Fla. Stat. §509.013 (15).

56.  The Landlord's property is not excluded from the Florida Residential Landlord and Tenant Act, Chapter 83, Fla. Stat. as a hotel because my occupancy was not transient. See Fla. Stat. § 83.42(3).

57.  I had a Non-transient occupancy of the unit making my tenancy governed by the Florida Residential Landlord and Tenant Act, Chapter 83, Fla. Stat.

58.  Due to my continued occupancy in the unit for over one month as my sole residence with the intent to remain indefinitely, I was not a transient guest. See Fla. Stat. § 83.43(10). See also

Frepon v. Lakeland Hospitality Inc., 12 Fla. L. Weekly Supp 783a (Polk Cty 2005).

59.  My Landlord was required to terminate my tenancy in accordance with the Florida Residential Landlord and Tenant Act, Chapter 83, Fla. Stat. in order to evict me. See Fleming v. Master 18 Fla. L. Weekly Supp 688a (Duval Cty).

60.  I later learned that, in the previous nine months, my Landlord had used proper process, by filing eviction lawsuits in Miami-Dade County's Landlord/Tenant Court, to evict three other non-transient tenants. My Landlord had also used proper process to evict two other non-transient tenants within the last two years. Thus, the Landlord's engagement of Officer Lawrence's police powers was deliberate and for the purpose of avoiding having to go through the time, costs and process of an eviction pursuant to Florida's Landlord/Tenant Laws.

61.  Because of my wrongful eviction, I was forced to move into a series of hotels, over the next three weeks, to keep a roof of my head, until I could find a new apartment and raise funds for move in expenses of first and last month's rent.  This period of homelessness caused me great stress. I had to beg and borrow money from friends to raise the funds necessary to rent a new apartment. This was humiliating.

62.  On December 12th, 2013, at 4:05 PM, I emailed Miami Beach Mayor Philip Levine and Miami Beach Police Chief, Raymond Martinez, and several other City of Miami Beach officials, including:  Jose Smith, City Attorney; Aleks Boksner, Assistant City Attorney; Brett Becker, Paralegal, City Attorney; Jimmy Morales, City Manager; Alejandro (Alex) Miranda, Mayor Levine's Chief of Staff; with CC to Officers Doty and Rodriguez.

63. In this email, I told the City Officials I was a longtime Miami Beach resident. (In fact, I have lived in Miami Beach since February, 1999.) I informed them that Officer Lawrence had wrongfully evicted me from my apartment. I noted the applicable Landlord/Tenant Laws which Officer Lawrence had violated (with links to the relevant Florida Statutes) and detailed Officer Lawrence's misconduct (in words consistent with the things I have stated in this Complaint).

64. I begged for help. I wrote, "the purpose of this email is not to butt heads with the City, or create an adversarial situation.  While I would hope the City and the police will recognize the error, rescind the ejectment,  and reinstate me to my residence, it may be hard to unscramble that egg.   My main purpose of this email is to reach out to the City with a request for emergency financial and housing assistance. Under the circumstance, since the City's employee, a MBPD Police Officer caused my distress and current homelessness, I hope the City can cut through reed tape and offer immediate and meaningful help.  Passing the buck to some sort of 'homeless outreach' would be unconscionable, under the circumstances."

65. In the days following my wrongful eviction, I went directly to City Hall. I went to Mayor Levine's office and asked to speak to the Mayor. The Mayor would not speak to me. I asked to speak to Alex Miranda, the Mayor's Chief of Staff.  I emailed Mr. Miranda and left voicemails for him. He would not speak to me and did not return my emails. Nobody would speak to me from the Mayor's office other than the receptionist, and the only he said to me is that nobody from the Mayor's office would speak to me. I waited in the reception area of the Mayor's office for several hours, on two consecutive days, and was completely ignored. Considering the damage I suffered at the hands of a Miami Beach Police Office, and that Miami Beach is a relatively small city which had made my hometown for nearly 15 years, I found the response, or lack of response, by Mayor Levine and his staff to be reprehensible and callous.

66.  At City Hall, I met with Charles "Chuck" Tear, Emergency Management Coordinator.  Mr Tear said he would talk with Joe Jimenez, Assistant City Manager.  I talked on the phone with Michael Aller, "Tourism and Convention Director and Chief of Protocal for The City of Miami Beach."  I sent copies of my earlier emails to these City Officials. They all refused to help me. Mr. Aller admitted he had, at his disposal, the resources to help, by providing emergency, short term hotel accomodations, but that he would not help me. He said, "you have to understand: The City was not responsible for making you homeless. We didn't do anything wrong. The officer didn't do anything wrong. It's not our fault. This is all your fault."

67.  The only thing that came of my correspondance with City Officials was I was contacted by Internal Affairs ("IA") in regards to my complaints about Officer Lawrence. I cooperated, fully, with the Internal Affairs investigation, and gave a lengthy interview to the Sergeant in charge of the investigation. He expressed concern, because it appeared, on face, that Officer Lawrence had acted improperly in assisting a wrongful eviction. However, Officer Lawrence denied any misconduct and disparaged me, and, as a result, the conclusion of Internal Affairs was that my complaints were unsubstantiated.

68.  Officer Lawrence told Internal Affairs he was "flagged down 11:33 (AM)" and that he remained "on call to 1:15 PM."  The IA Report said, "When asked if Mr. Ortega provided him with any documentation supporting his claim that Mr. Harvey did not reside at the hotel, Officer Lawrence stated no. However, it was immediately apparent to Officer Lawrence that Hotel Pierre was a public lodging establishment. Officer Lawrence denied having a friendship with Mr. Ortega and did not recall having any previous contact with him or Mr. Harvey... He recalled that Mr. Harvey's personal belongings were strewn on the floor and appeared as if a homeless person

14

- - -

had been residing in the room. He characterized the appearance of the room as 'trashy' and recalled that a strong odor of lysol or insect spray was noticable."

69. According to the report, Sgt. Campbell told Internal Affairs he "researched the Law Enforcement Handbook and consulted with Lt. Acosta and NRO (Neighborhood Resource Officer) Bianco."

70. The Internal Affairs Report summarized Sgt. Houser's invovlment, saying, "Mr. Harvey informed Sergeant Houser that he had been 'illegally' evicted by Officer Lawrence at the manager's behest and wanted to be let back in the room recalling that he was knowledgable in landlord/tenant law. As a result, Sergeant Houser contacted the Miami-Dade State Attorney's Office and was advised that the incident was a civil matter. Additionally, Sergeant Houser also spoke on the phone with Hotel Pierre's Manager, Juan. Juan advised Sergeant Houser that Hotel Pierre was licensed by the City of Miami Beach to operate as a hotel, and that Mr. Harvey was a guest who had not paid for his room in two weeks." Though the manager lied to Sgt. Houser, even if all his statements were true, none of these putative facts would have justified Officer Lawrence assisting in an illegal eviction.

71. By a Public Records Request, I received a copy of the Internal Affairs report. Arguendo, though my complaints about Officer Lawrence's offensive language and threatening behavior could be considered a triable issue of fact; it cannot be disputed that the City's failure to conclude that his acts using his police powers to illegally evict me was anything other than inexcusable. This is incontrovertible evidence that the City of Miami Beach condoned Officer Lawrence's misuse and abuse of police powers.

72. My Public Records Request revealed that Officer Lawrence had, previously, been the subject of at least eight serious complaints of severe misconduct, including the sort of violent and threatening behavior he unleashed on me. These included incidents of "Battery," "Excessive Force," "(failure to behave with) Courtesy and Respect," and "Falsifying Official Reports." Each of those cases also resulted in a finding of "unsubstantiated."

73. Had The City of Miami Beach not repeatedly let this awful cop off the hook, by sweeping his messes under the rug, he might have long ago been removed from the force, as he should have been, and I would not have been harmed.

74. Miami Beach has a long and sordid history of allowing its wealthy business to use its Police Department as private security. Because of this policy, when Police operate under this conflict of interests, they are no longer neutral, but "serve their masters" at the expense of the public's right to be treated fairly and equally. In fact, Officer Lawrence had a history of working "private security" for local hotels, including at The Gansevoort South Hotel in Miami Beach. The City of Miami Beach knew, or should have known, that Officer Robert Lawrence was a dangerous, violent, threat to the public, based on his conduct while working security at The Gansevoort.

75. In fact, The City of Miami Beach and Officer Lawrence were both Defendants in a previous lawsuit filed in The United States District Court, Southern District of Florida, Case No: 10-20812-CIV-HUCK/O'SULLIVAN.  As a ruling by The Court stated in that case: "On January 1, 2009, plaintiff Jeffrey Roth, a guest at the Gansevoort South Hotel in Miami, sought to reach his suite so as to speak with his wife regarding a family emergency. Thwarted by an overcrowded elevator filled with partygoers, Roth approached defendant Robert Lawrence, an off-duty Miami

16

- -

Beach police officer working as the Hotel's security guard, seeking his assistance. Roth alleges that Lawrence responded in a 'nasty tone,' pushed or threw him against a wall, repeatedly struck him, handcuffed him, and removed him to an abandoned parking lot where he was held until the decision was made to arrest him. All criminal charges against Roth were eventually dismissed."

76.  Officer Lawrence's career with the City of Miami Beach finally came to an end approximately a year after he violated my Civil Rights when he was forced to resign (or be fired), for walking up to a homeless man, who was sleeping in front of the Gansevoort, and, with absolutely no provocation, striking him in the face. Despite his denials in that incident, Officer Lawrence was caught striking the homeless man on one of the hotel's security cameras. The incident was widely reported in the local news media and Officer Lawrence was investigated by the State Attorney's Office on Battery charges. However, according to reports, (and, therefor, I say on Information and Belief), Officer Lawrence was not charged because the homeless man apparently left the jurisdiction and could not be located.

## CONCLUSION AND CLAIMS

77.  Officer Robert Lawrence illegally entered my apartment, used excessive force by threatening me with arrest, (though his actions also did constitute an illegal, unwarranted arrest, or "False Arrest"), bodily injury and the loss and destruction of my personal property, and forced me from my home with his illegal acts. Officer Robert Lawrence violated my Constutional Rights, including those guaranteed to me by the 4th, 5th, and 14th Amendments.

78.  City of Miami Beach was involved, and thererfore also responsible and liable for the deprivations of my Constitutional Rights, including those guaranteed to me by the 4th, 5th, and 14th Amendments. The City of Miami Beach failed to properly train, supervise and set policies

17

-   -

for its officers, including Officer Robert Lawrence, who may be called by Landlords attempting to do a self-help eviction using police powers, as a shortcut to going through the time, cost and process of an eviction of non-transient tenants pursuant to Florida's Landlord/Tenant laws. The City of Miami Beach failed to train Officer Lawrence so that he would know these laws.

79. Before Officer Robert Lawrence injured me, I informed The City of Miami Beach's Neighborhood Resource Officers, twice, (once by email and once by voicemail), that I feared my Landlord would attempt a self-help eviction, and begged them to intervene. They ignored my pleas for help.

80. While Officer Lawrence was engaging in his illegal acts, I called the City of Miami Beach Police Department, and begged them to send a supervising officer to come and help me and stop Officer Lawrence from hurting me. They ignored this plea, as well. This is evidence that the City of Miami Beach did not properly supervise Officer Lawrence and contributed to my injuries.

81. Immediately following my unlawful eviction, I begged the Miami Beach Police, including two Sergeants, to reinstate me in my home before the end of the day. They refused.

82. In the days that followed, I begged for help from approximately one dozen City of Miami Beach Officials, including the Mayor, the City Manager and the City Attorney, to help me through emergency housing assistance, to mitigate the damage their employee, Officer Robert Lawrence inflicted on me. I informed them in great detail of Officer Lawrence's illegal acts. They all ignored me with a callous disregard.

83.  An Internal Affairs investigation of Officer Lawrence's misconduct concluded my claims were unsubstantiated, even though Officer Lawrence, on face, violated statutory, black letter law, in evicting me, a non-transient tenant, from my home, in violation of Florida's Landlord/Tenant laws, and the process a Landlord must follow to evict a non-transient tenant. The finding of the Internal Affairs investigation condoned Officer Lawrence's illegal misuse of his police powers. This is evidence that the City of Miami Beach's own policies contributed to my injuries.

84.  Officer Robert Lawrence had a long history of violent, threatening, and illegal behavior, including several previous Internal Affairs complaints and at least one previous Federal lawsuit where the City was named as a co-defendant after he beat and wrongfully arrested a man while working as an off duty security guard. The City of Miami Beach knew, or should have known, that Officer Robert Lawrence was a violent, threatening, dangerous man: a "ticking timb bomb," unfit to wear a police uniform and a danger to the public. Officer Lawrence should have been relieved of duty long before he injured me by depriving me of my Civil Rights; and before he was, eventually, forced to retire for a final act of violence in uniform, when he struck a sleeping and defenseless homeless man: an act he would have gotten away with had he not been "caught on camera."

85.  Because of its own failures in training, supervising and setting policies, The City of Miami Beach actively participated in my injuries and is liable pursuant to *Monell v. Department of Social Services, 436 U.S. 658 (1978)* and the doctrine of *respondeat superior.*

86.  WHEREFORE, I respectfully pray for judgment against these defendants, jointly and also individually/severally, in the amount, at least, of $1,000,000, plus such further sums as an assessment at trial will show, plus interest, statutory costs and disbursements, and such other and

further relief as may be just.

## DECLARATION UNDER PENALTY OF PERJURY

87.  The undersigned declares under penalty of perjury that I am the plaintiff in the above action, that I have read the above complaint and that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Respectfully Submitted,

-------------------------------------

Russel Harvey, Plaintiff, *Pro-se*

December 11th, 2017



FROM:
Russel Hasley
1300 Washington Ave
PO Box 190437
Miami Beach, FL
33169-9998

TO:
COURT CLERK
US. DISTRICT COURT, SOUTHERN D
400 N. MIAMI AVE

USPS TR
9500 1141

UNITED STATES
POSTAL SERVICE
1005



Utility Mailer

UNITED STATES POSTAL SERVICE ®

0  15645 72728  1

AIC-093
Product Code 93300004 - July 2013
www.usps.com
A product of the United States Postal Service ®
MADE IN THE U.S.A.